UNITED STATES of America, Plaintiff,

v.

CITY OF BUFFALO, a Municipal Corporation, Thomas R. Blair, Police Commissioner, City of Buffalo Police Department, Anthony J. Colucci, Herbert L. Bellamy, Frank A. Stachowiak, Commissioners, City of Buffalo Civil Service Commission, Buffalo Police Benevolent Association, Defendants.

UNITED STATES of America, Plaintiff,

v.

CITY OF BUFFALO, a Municipal Corporation, Karl K. Kubiak, Fire Commissioner, City of Buffalo Fire Department, Anthony J. Colucci, Herbert L. Bellamy, Anthony S. Kowalski, Commissioners, City of Buffalo Civil Service Commission, Defendants.

Nos. Civ.–1973–414, Civ.–1974–195.

United States District Court,
W. D. New York.

Aug. 1, 1978.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (James S. Angus, and Grover G. Hankins, U. S. Dept. of Justice, Washington, D. C., of counsel), for the Government/Plaintiff.

Joseph P. McNamara, Corp. Counsel, Buffalo, N. Y. (James J. McLoughlin, Buffalo, N. Y., of counsel), for defendants City of Buffalo, Thomas R. Blair, Anthony J. Colucci, Herbert L. Bellamy, Frank A. Stachowiak, Karl K. Kubiak, and Anthony S. Kowalski.

Nicholas J. Sargent, Buffalo, N. Y., for the defendant Buffalo Police Benevolent Association.

CURTIN, Chief Judge.

This case is a consolidated civil rights action brought by the United States Attorney General [hereinafter "Government"] challenging the employment practices of the Buffalo Police Department and the Buffalo Fire Department.

The suit against the Police Department was originally filed in August 1973. It was brought against the City of Buffalo, the Police Commissioner, the Commissioners of the Buffalo Civil Service Commission who are responsible for civil service operations including entrance and promotional examinations, and the Buffalo Police Benevolent Association [BPBA], the labor organization which acts as collective bargaining agent for employees of the Police Department. The action sought to enforce Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e *et seq.*,[1] and the rights guaranteed by the fourteenth

---

1. Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) states the central premise of the Act:

    It shall be an unlawful employment practice for an employer—

    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

amendment to the United States Constitution and by 42 U.S.C. §§ 1981 and 1983. On July 29, 1974 the complaint was amended to add the enforcement of the provisions of the State and Local Fiscal Assistance Act of 1972 (Pub.L. 92–512, 86 Stat. 919), 31 U.S.C. §§ 1221 *et seq.* Jurisdiction in this court is based on 42 U.S.C. § 2000e–6(b), 28 U.S.C. §§ 1343(3), 1343(4), 1345 and upon 31 U.S.C. § 1242.

The Government filed the action against the Buffalo Fire Department on April 24, 1974 to enforce the same statutory and constitutional provisions with the same jurisdictional bases. On May 8, 1974, with the consent of all parties, the two suits were ordered to be consolidated. After some months of pre-trial discovery, the actions were brought to trial on April 1, 1975 and concluded on April 21, 1975. Subsequently the parties submitted proposed findings of fact and conclusions of law. In the autumn of 1976, at the direction of the court, the parties submitted further briefs regarding several new case law developments. Due to the heavy demands of other court business resulting from the death of Honorable John O. Henderson and from several protracted lawsuits before this court, I was unable to render my decision earlier.

Essentially the suits allege a pattern or practice of discrimination against minorities. The Government challenges the hiring requirements of both the Police and Fire Departments, namely, written examinations, height and other physical standards, the high school diploma requirement, and the longstanding absolute prohibition against women as either patrolmen or firefighters. Further, certain terms and conditions of employment are attacked, including both general policies and a number of specific incidents which have occurred in past years. Finally, several individual claims of employment discrimination have been raised for which individual relief is sought.

Since these suits were initiated both the Police and Fire Departments refrained from appointment of any candidates based upon the eligibility lists derived from the 1973 examinations. However, by a stipula-tion between the City and the Government filed on May 5, 1977, a number of firefighter appointments were approved based upon a formula embodied in the stipulation. The patrolman eligibility list based upon the examinations in question expired on April 4, 1977. The firefighter eligibility list in question expired on June 20, 1977.

## LEGAL STANDARD

As mentioned above, the Government seeks to enforce a number of statutory and constitutional provisions in this suit. Although these provisions may apply to all of the practices cited here, each imposes a different standard of liability.

■ The standard for proof of a constitutional violation under §§ 1981 and 1983 is decidedly more exacting than that under Title VII. Since this case was argued, the United States Supreme Court has issued a major opinion on employment discrimination in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Court majority distinguished the standards for a finding of a violation of Title VII from that required to find invidious discrimination under the equal protection clause of the fourteenth amendment to the United States Constitution. Under Title VII a court may focus solely on the racially disproportionate impact of the challenged hiring practice, but to establish a constitutional violation, the acts in question must demonstrate a *racially discriminatory purpose*. See *Washington v. Davis, supra* at 238–9, 96 S.Ct. 2040.

■ Specific criteria have been established by the Supreme Court for review of job hiring requirements under Title VII. If a test for employment or promotion has a disproportionately adverse effect on black applicants, it is unlawful under Title VII unless it is shown to be related to job performance. In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Court stated:

The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in opera-

tion. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related ·to job performance, the practice is prohibited. 401 U.S. at 431, 91 S.Ct. at 853.

In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court amplified the law by ruling that a prima facie case of discrimination is established where evidence shows that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. 422 U.S. at 425, 95 S.Ct. 2362. Upon such a showing of disproportionate impact the burden of persuasion shifts to the employer to show that any given requirement has a manifest relationship to the employment in question, and that the disparity is the product of nondiscriminatory factors. *Griggs, supra* 401 U.S. at 432, 91 S.Ct. 849. Furthermore, since Title VII explicitly prohibits discrimination based upon sex as well as upon race, this standard should also be applied when sex is at issue. *See Bowe v. Colgate-Palmolive Co.,* 489 F.2d 896, 900 (7th Cir. 1973).

It should be noted that the legal standard under the State and Local Fiscal Assistance Act closely parallels that found under Title VII. Section 122(a) of the Act, 31 U.S.C. § 1242(a), states:

> No person in the United States shall on the grounds of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under [the Act].

Further regulations issued by the Secretary of the Treasury under this provision state:

> In any program or activity funded in whole or in part with entitlement funds, a recipient government may not . . subject any individual to discrimination on the ground of race, color, national origin, or sex in its employment practices. 31 C.F.R. § 51.53(a).

The regulations also state that the standards for determination of employment discrimination under this Act are ordinarily the same as standards used by the Equal Employment Opportunity Commission under Title VII. 31 C.F.R. § 51.53(b). Since regulations promulgated pursuant to rule-making authority granted by statute have the force of law, *see, e. g., Federal Crop Ins. Co. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947), this court may apply virtually the same standard as found under Title VII in this case. *See United States v. City of Chicago,* 549 F.2d 415, 440 (7th Cir. 1977).

## MOOTNESS

A question of mootness has arisen in regard to several of the hiring practices involved in this suit, namely, the written examinations, the physical examinations, and the height requirements in effect in 1973. As mentioned previously, the eligibility lists for both patrolman and firefighter positions based upon those requirements have expired without any appointments based upon them.

The mootness doctrine, which is derived from article III of the Constitution, prevents the court from ruling on the merits of a question when the court can no longer grant relief which would have any practical effect. *See Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *see generally* 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3533 at 263 (1975). The focus tends to be on the ability of the court to provide any presently meaningful remedy in light of the court's ability to surmise continuing effects or to forecast possible future effects. Wright, Miller & Cooper, *supra* at 270.

Looking to the claims alleged in this suit, I find that the constitutional violations alleged regarding hiring practices are moot. Since the eligibility lists have expired, no appointments will be made from them. Therefore no direct discriminatory impact may result which would amount to a consti-

tutional violation. However, such a violation might still be proved in the denial of equal terms and conditions of employment if the requisite discriminatory intent is shown.

In the Title VII claims, on the other hand, the Government has alleged a "pattern or practice" of discrimination.[2] This requires that a somewhat different perspective be taken on the hiring practices in question. A brief review of the nature of this claim will demonstrate the different issues of proof involved.

■ The term "pattern or practice" was not intended as a term of art and the words reflect only their usual meaning. *See Teamsters v. United States*, 431 U.S. 324, 336 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also United States v. Ironworkers Local 86*, 443 F.2d 544, 552 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). The Supreme Court has restated the burden of proof as follows:

[T]he Government ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice. *Teamsters v. United States, supra* at 336, 97 S.Ct. at 1855.

■ In a pattern or practice suit the court must focus on the employment system

as a whole rather than just a part of it. *United States v. United States Steel Corp.*, 371 F.Supp. 1045, 1053 (N.D.Ala.1973), *modified*, 520 F.2d 1043 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976). The rules and procedures of an employer must be examined to determine whether they meet legal standards and, if not, to determine how to correct them. A substantial number of incidents of differential treatment may lead to a finding that such treatment is characteristic of the system as a whole which would require correction. *Id.*

■ In addition, in this type of suit, evidence of an employer's discriminatory practices prior to the effective date of Title VII is admissible for several purposes.[3] It may be admitted to illuminate the purpose and effect of present policies, *United States v. Local 1, Ironworkers*, 438 F.2d 679 (7th Cir. 1971), *cert. denied*, 404 U.S. 830, 92 S.Ct. 75, 30 L.Ed.2d 60 (1971), or the existence of a long-standing pattern or practice continuing to the present. *Local 53, Asbestos Workers v. Vogler*, 407 F.2d 1047 (5th Cir. 1969); *United States v. Local 36, Sheet Metal Workers*, 416 F.2d 123 (8th Cir. 1969). It may also be admitted to show that present policies, although neutral on their face, perpetuate the effects of past discrimination. *United States v. Local 38, IBEW*, 428 F.2d 144 (6th Cir. 1970), *cert. denied*, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *United States v. Local 1, Ironwork-*

---

**2.** 42 U.S.C. § 2000e–6(a) states:

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States . . . requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

**3.** Title VII did not strictly apply to municipal government bodies until it was amended in 1972. 42 U.S.C. § 2000e(b), as amended by Pub.L. 92–261 § 2(2). It has been held that the 1972 amendments have no retroactive effect where they create new substantive rights. *Popkin v. New York State Health and Mental Hygiene Facilities Improvement Corp.*, 547 F.2d 18, 20 (2d Cir. 1976); *see also Weise v. Syracuse University*, 522 F.2d 397 (2d Cir. 1976); *Monell v. Department of Social Services*, 532 F.2d 259, 261 (2d Cir.), *aff'd on other grounds*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Therefore, although the court cannot retroactively apply Title VII standards before the 1972 amendments to grant individual damage relief in this case, it may look to prior pattern or practice to fashion other appropriate relief.

*ers, supra.* Finally it may be introduced to determine what relief is appropriate to correct the effects of past discrimination and to prevent future discrimination. *Rios v. Enterprise Ass'n Steamfitters,* 501 F.2d 622, 629 (2d Cir. 1974).

█ Therefore it is my conclusion that to rule upon the pattern or practice claim it is necessary to consider not only the practices prior to 1972 but also those hiring practices in 1973 which are no longer in effect. Although these never resulted in actual appointments to the departments, they do bear upon the purpose and effect of present practices and upon a determination of equitable relief.

I will turn next to an examination of the various claims made by the Government.

## I. GENERAL POPULATION STATISTICS

The plaintiffs have introduced 1970 United States Census figures which show that the population of the City of Buffalo is 20.4% black and between 3.2% to 3.9% Spanish-surname Americans [hereinafter "SSA"].[4] In addition, the labor force in the City is 17.5% black and 40.6% female.[5]

Since commencement of this suit in November 1973, no appointments have been made to entry level uniformed positions within the Buffalo Police Department. At that time the Police Department employed 1395 uniformed personnel of whom 36 (2.6%) were black males, 2 (0.1%) were black females, 3 (0.2%) were SSA males, and 16 (1.1%) were white females. As of the same date the Department employed 911 patrolmen of whom 24 (2.6%) were black males and 3 (0.3%) were SSA males. No women were employed in the patrolman position. Meanwhile, of the 42 police cadets employed by the Department at that time, 3 (7.1%) were black males.

At that time the Police Department also employed 95 full time non-uniformed personnel (clerks, typists, cleaners, etc.). Of these 45 (47.4%) were white females, 2 (2.1%) were black males and 5 (5.2%) were black females. Of the 7 blacks employed, 5 were cleaners or charwomen.

As of June 1974 the Fire Department employed 1173 uniformed personnel of whom 14 (1.2%) were black males. No females and no SSA males were employed in uniformed positions. At the same time 874 firefighters were employed of whom 14 (1.6%) were black males. Aside from appointments made in June 1977 pursuant to a consent decree between the Government and the Fire Department, no other appointments to uniformed positions have been made since June 1974.

█ While a discrepancy between the minority community population and the population employed by defendants may not of itself be sufficient to establish a prima facie case of discrimination it, at least, invites further inquiry. *See Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n,* 482 F.2d 1333, 1335 n. 4 (2d Cir. 1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975).

Here the evidence indicates a substantial disparity between the general black, SSA, and female population in the City of Buffalo and the representation of those groups in the work force of the Police and Fire Departments. The defendants have introduced a number of documents (Def. Ex. 2–3) to substantiate their efforts to recruit minority applicants for qualifying examinations, including those for the police cadet and community peace officer positions. Without ruling on whether this statistical evidence alone is sufficient to establish a prima facie case, I find that it gives a strong indication of discriminatory impact which requires further inquiry as follows.

## II. WRITTEN EXAMINATIONS

The Government argues that both the Police and Fire Departments have made use

---

**4.** The city's black population figure is derived from the 1970 United States Census, while the SSA population has been estimated by Mr. Raul Russi and the City Manpower Council based upon a formula supplied by the United States Department of Labor (Tr. 300–301).

**5.** 1970 United States Census, PC(1)–C(34) (New York, Tables 85, 92).

of written examinations in their job selection process which have had a discriminatory impact upon black and SSA candidates for positions.

The examinations in question which were prepared by the New York State Department of Civil Service and administered by the Buffalo Civil Service are the 1973 patrolman examination (965–C), and the 1973 firefighter examination (966–B). The 1971 police cadet examination (965–B) will also require consideration.

## A. DISPROPORTIONATE IMPACT

■ The plaintiffs may make a statistical showing of disproportionate passing rates to establish a prima facie case of discrimination. *Cf. Teamsters, supra.* Such a comparative study of the pass-fail ratios of different racial and ethnic groups has been found to establish a prima facie case of discrimination in a number of instances. *See Chance v. Board of Examiners,* 458 F.2d 1167 (2d Cir. 1972); *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n, supra.*

A racially disproportionate impact need not be proven with mathematical certainty. *Vulcan Society of N. Y. City Fire Department, Inc. v. Civil Service Comm'n.,* 490 F.2d 387, 393 (2d Cir. 1973). A variance in the pass rate of more than 1½ times between whites and black or SSA candidates has been found sufficient to shift the burden of proof in a number of cases. *See Bridgeport Guardians, supra* at 1335 n. 3.

■ Of the 621 people taking the February 1973 written patrolman examination (965–C), 86.6% were white, 11.7% were black and 1.6% were SSAs. The New York State Department of Civil Service designated 70% as a passing grade. The examination results showed that 43.4% of the whites received at least a 70% grade while only 8.2% of the blacks and 10% of the SSAs achieved a passing score.

Of the 872 men taking the firefighter written examination in January 1973 (966–B), 85.4% were white, 12.8% were black, and

1.7% were SSAs. Again, the New York State Department of Civil Service designated 70% as a passing grade. Examination results showed that 80.5% of the whites received at least 70%, while 36.6% of the blacks and 26.7% of the SSA men achieved a passing score.

The record indicates that the written examinations comprise only one-half the total score; the other half is based upon physical agility and height/weight scores. Theoretically, an applicant could pass the overall test while receiving a score of 40 on the written component. Defendants argue, therefore, that the written examination has no discriminatory impact. The court finds this reasoning unpersuasive. The construction of the written examination is such that minority applicants are placed at a great disadvantage just to reach the required overall certification score of 140. Furthermore, the actual point total, even if one attains a passing score, is determinative of ranking on the eligibility list. The lower the score achieved on the written examination, the less chance one has of eventually obtaining a position.

By its showing of a significant disparity between the passing grades of whites and both black and SSA candidates, the plaintiff has established a prima facie case of discrimination in the Police and Fire Department testing programs.

## B. RELATION TO JOB PERFORMANCE

■ The establishment of a prima facie case of discriminatory impact shifts the burden of proof to the defendants. *Griggs, supra* 401 U.S. at 432, 91 S.Ct. 849. This burden includes not only the burden of production but also the burden of persuasion. *Vulcan Society, supra* at 393. The defendants must show a demonstrable relationship between the test results and successful performance of the job for which it was used. *Griggs, supra* 401 U.S. at 431, 91 S.Ct. 849; *Bridgeport Guardians, supra* at 1337.[6]

---

**6.** In *Washington v. Davis, supra*, the Supreme Court made additional findings regarding the

application of Title VII standards to job testing. It held that, based upon the facts in that case, a

Such tests are impermissible unless shown, by professionally acceptable methods, to be "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." *Albemarle Paper, supra* 422 U.S. at 431, 95 S.Ct. at 2378. In order to meet their burden of proving a relationship between test results and job performance, the defendants must show that validation studies have been made of the tests. Three basic types of validation have been recognized by the courts as professionally acceptable, namely, criterion, content and concept validation. *Id.*

In this case, the two forms of test validation which the parties have discussed regarding the patrolman examination are criterion and content validation. Essentially, criterion related validity results from a statistical comparison of test performance with some measure or measures (criterion) of job performance. Content validity, on the other hand, is established through a showing that the content of the test is actually a representative sample of the important elements of the job itself. *See* Tr. at 616; American Psychological Association Standards for Educational and Psychological Tests [A.P.A. Standards] at 29. The Supreme Court in *Albemarle* expressed a strong preference for criterion validity as described in the EEOC Guidelines On Employee Selection Procedures, 29 C.F.R. § 1607 *et seq.* [EEOC Guidelines]. 422 U.S. at 431, 95 S.Ct. 2362. The EEOC Guidelines permit the use of content validation only where the criterion test is not technically feasible. The burden here falls upon the defendants to show that such validation cannot be performed. EEOC Guidelines, 29 C.F.R. § 1607.5(a).

### 1. *1973 FIREFIGHTER EXAMINATION*

The defendants have offered absolutely no evidence of the performance of any validation study upon the 1973 firefighter examination (966–B). By this failure to demonstrate a necessary relation between the test and job performance, the defendants have violated Title VII of the Civil Rights Act as interpreted in *Griggs* and *Albemarle Paper* through use of the 1973 firefighter examination.

### 2. *1973 PATROLMAN EXAMINATION*

Next, we must examine the defendants' claim that the 1973 patrolman examination (965–C) meets the standards developed for validation. Defendants make no clear showing that criterion validation was unfeasible here. Instead, they introduce evidence that a "factor analysis" was performed on the June 1971 examination (965–B) (Tr. 710). They contend that this analysis is a form of content validation which should apply to the 1973 patrolman examination as well. Leaving aside an evaluation of the sufficiency of the factor analysis on the 1971 examination for the moment, this court finds that the 1973 examination has not been properly validated on other grounds.

First, testimony by the defendants' own witness establishes that the 1973 examination differed in major respects from the 1971 examination (Tr. 735). Therefore, the factor analysis performed on the earlier examination cannot be found to bear on the content validity of the 1973 examination.

Second, content validation requires that a substantial job analysis be performed to demonstrate the relevance of the test con-

---

positive relationship between the test results and the requirements of the police training program had been demonstrated which satisfied the job relation requirement under Title VII.

The impact of *Washington v. Davis* upon the application of Title VII job relation requirements is unclear. *See* Justice Stevens concurring opinion, 426 U.S. at 255, 96 S.Ct. 2040; *see* also *United States v. City of Chicago*, 549 F.2d 415, 431 (7th Cir. 1977). In the present case, however, defendants have made no attempt to validate the examinations in question, even to demonstrate a relation to performance in the training program. Therefore the Title VII standards enunciated in that case are of no support to defendants here.

tent to the job characteristics. The job analysis should clearly define, in a written report, the job duties and the method by which they were obtained. EEOC Guidelines § 1607.5(a); A.P.A. Standards, *supra* at 29. In preparation of the 1973 examination the job analysis consisted of a job description provided by the City of Buffalo and the personal knowledge of that job possessed by the Associate Police Examiner (Tr. 675–679). No on-site observations were made of the patrolman job (Tr. 678–80), and the personal job experience upon which the examiner based his determinations was totally unrelated to urban patrol work (Tr. 678–80). Thus the job analyses in this case are clearly insufficient.

Third, the standard imposed for content validation demands that the content in the test include all, or nearly all, important parts of the job. A.P.A. Standards, *supra* at 29. Although the examiner admits that numerous critical areas of work behavior are involved in the patrolman job, only three areas were tested: good judgment, preparation of written material, and the understanding and interpretation of reading material (Tr. 681–683). Therefore, the defendants' efforts at validation must again be found insufficient.

The defendants have introduced evidence that the 1973 examination was subjected to a language analysis by a black linguistic expert in order to eliminate any discriminatory impact in the language of the examination (Tr. 74). However, the court finds that this effort by itself does not mitigate the overall impact. Only the judgment section of the examination was so treated (Tr. 714), and this analysis really goes to the form of the questions rather than to their substance and their relation to job performance. The combination of the above factors leads inevitably to the conclusion that the 1973 police examination fails to meet the standards required for validation and therefore must be found to have violated Title VII.

### 3. *1971 POLICE CADET EXAMINATION*

Plaintiff has introduced no pass rate statistics on the 1971 examination to establish a prima facie case of discriminatory impact. Therefore, this court does not reach the question whether the 1971 examination (965–B) also violates the requirements of Title VII.[7]

In conclusion, the court finds that the defendants have failed to show the validity of the 1973 written patrolman examination and of the 1973 written firefighter examination. As such, they do not meet the standards set by the Supreme Court and stand in violation of Title VII.

### III. *HEIGHT REQUIREMENTS*

The Government also alleges that the defendants have made use of height requirements as a selection device which has an adverse impact upon SSA and female applicants in violation of Title VII.[8]

The Buffalo Police Department is mandated by New York Civil Service Law § 58

---

7. However, for determination of the pattern or practice followed by the Police Department, a brief review of the 1971 examination should be noted. The factor analysis of the 1971 examination does not meet the standards for professional validation. It suffers from the same infirmity as the 1973 examination, namely, that an insufficient job analysis was prepared. In 1971 the examination was used throughout the state to select patrolmen, while in Buffalo it was used to select both police cadets and community service officers. No effort was made to distinguish different content factors for three jobs entailing extremely different qualifications.

8. The Government also argues that the Police Department's minimum height standards violated Law Enforcement Assistance Administration guidelines on nondiscrimination in federally financed programs. 28 C.F.R. §§ 42.201 *et seq.* and 42.301 *et seq.* These regulations are binding upon all municipalities which receive LEAA funds except where the recipient can demonstrate convincingly through the use of supportive factual data, such as professionally validated studies, that such height requirements are an operational necessity for designated job categories. Since the City of Buffalo does receive LEAA funding, it is bound by these regulations. However, since no appointments were made from the 1973 eligibility lists, this claim is now moot.

to follow the height, weight, and physical fitness requirements prescribed by the Municipal Police Training Council. Prior to and including the last competition for patrolman in 1973, persons applying for appointment were required to be at least 5'9" in height. During the last competition for police cadet, applicants were required to be at least 5'7" in height; prior to that they were required to be at least 5'9" in height. For the position of firefighter, applicants were required to be at least 5'7" in height prior to and including the last competition in 1973. Applicants meeting these minimum physical requirements were then permitted to take written and physical agility examinations. Since this case was initiated, the Municipal Police Training Council has abandoned absolute height standards in favor of a weighted system. (Pl. Ex. 15, Height, Weight and Physical Fitness Standards for Police Officer Candidates, Revised 1974 [hereinafter "M.P.T.C. Standards"]).

■ The legal standard to be applied to height requirements under Title VII is the same as that which is applied to any selection standard. *Griggs v. Duke Power Co., supra.* If the plaintiff can show a prima facie case of disproportionate impact upon minorities or women, the defendants then have the burden to show that such standards are related to job performance. In this case it will be necessary to examine the minimum height requirements prior to and including the 1973 job competition separately from the M.P.T.C. Standards currently in force.

## A. *MINIMUM HEIGHT STANDARDS*
■ The Government has introduced statistical findings to show a prima facie case of discrimination against both women and SSA individuals through the use of the absolute height requirements of 5'9" for

police patrolman and of 5'7" for firefighter and police cadet. According to a United States Department of Health, Education, and Welfare publication, males between the ages of 18 and 24 average 68.7" (5'8.7") in height, while females in the same age group average only 63.8" (5'3.8") in height.[9] This necessarily eliminates the vast majority of American women from job selection as a patrolman or firefighter and has a disproportionate effect upon them. Furthermore, statistics for the New York State and New Jersey geographical area introduced by the Government show that the 5'9" standard eliminates 80.6% of SSA males aged 17 to 26 as compared to only 48.5% of non-SSA males.[10] The 5'7" standard eliminates 54.7% of SSA males aged 17 to 26, but only 21.3% of non-SSA males.[11] These disparities certainly establish a prima facie case of discrimination through use of absolute height requirements.

■ The burden now falls to the defendants to justify the absolute height requirements as job related. They have introduced the testimony of Police Commissioner Blair as to the importance of height in successful job performance by police officers. He stated that the average height of males 18–34 in the northeast United States is 5'10" and that approximately 60% of the male arrestees in the City of Buffalo are 5'9" or taller. Furthermore,' it was his opinion that the height of police officers serves as a deterrent to the need for use of force by the police since it will keep people from engaging in antisocial acts and will enable the police to obtain submission with minimum use of force (Tr. 973–74). Although the opinions of the Commissioner are to be accorded substantial weight due to his experience in the field of crime control, standing alone they do not provide suffi-

9. Karpinos, Bernard D., Giesecke, G. Lee, and Scheflen, Kenneth G. *American Male Youths Examined for Military Service: Height by Race, Selected Ethnic Groups, Age, and Selected Geographic Areas, Fiscal Year 1972,* Consulting report CR–D7–74–141 (May 1974).

10. Vital and Health Statistics Data From The National Health Survey Series 11, Number 8, DHEW Publication No. (HRA) 76–11074 (U. S. Department of Health, Education and Welfare, Public Health Service).

11. *Id.*

cient justification to uphold minimum height requirements.[12]

Defendants also argue that several courts have supported the position that height is related to successful police performance. In this regard they cite *Castro v. Beecher*, 334 F.Supp. 930 (D.C.Mass.1971), *aff'd* 459 F.2d 725 (1st Cir. 1972) [5'7" standard upheld], and *Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976), *reh. denied*, 429 U.S. 933, 97 S.Ct. 341, 50 L.Ed.2d 303 (1977) [5'8" upheld]. In *Castro*, however, the action was brought under 42 U.S.C. § 1983 for violation of equal protection rights, not under Title VII. The district court therefore applied the equal protection "reasonableness" standard which is less stringent than the Title VII requirement of direct relation to job performance. Furthermore, the circuit court in review of this issue held that the plaintiffs had failed to demonstrate any disproportionate impact to establish a prima facie case. The court stated therefore that only a "relaxed" standard of review need apply. 459 F.2d at 734. Thus *Castro* can easily be distinguished from the present case where a strong statistical showing has been made and the claim of discrimination falls under Title VII standards.

The other case cited by the defendants, *Smith v. Troyan, supra,* may also be distinguished from the case at hand. There once again the plaintiffs based their challenge to minimum height requirements upon 42 U.S.C. § 1981 and not Title VII.[13] The Sixth Circuit's finding that the height requirement met the "reasonableness" standard under the equal protection clause, therefore, is not determinative in this action.[14]

Recently the Supreme Court in *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), held that a minimum height/weight requirement of 5'2" and 120 pounds for a position as a prison guard in Alabama violated Title VII since it had a disproportionate impact upon women based upon national statistics which the state was unable to justify as job related. Other courts have held no substantial relationship exists between height requirements and job performance as a police officer or firefighter. *See League of United Latin American Citizens v. Santa Ana*, 410 F.Supp. 873, 898–900 (C.D.Cal.1976) [5'7" firefighter and 5'8" patrolman requirements found to violate Title VII]; *Mieth v. Dothard*, 418 F.Supp. 1169, 1182 (M.D.Ala.1976) [5'9" requirement for state trooper position found

---

**12.** The court takes note that elsewhere numerous other factors have generally been cited as justification for the importance of height in performing the duties of a police patrolman. Among those cited are the ability to view in crowds, arm reach, ability to absorb blows, the ability to impress others with physical prowess and other immeasurable advantages of height. The federal district court in Cleveland took extensive testimony on each of these factors before concluding that the height requirements were not reasonable. *See Smith v. City of East Cleveland*, 363 F.Supp. 1131 (N.D.Ohio 1973), *rev'd sub nom. Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).

The court also notes the traditional view that height is essential to successful performance as a police officer because it is assumed to reflect physical strength and ability. Height is suggested to establish the policeman as a "culture hero" for the community, both law-abiding citizens and potential lawbreakers. *See* Tr. at 598.

However, little research has been performed to clearly establish the validity of these assumptions underlying the use of height as an

employment standard. On the other hand, two recent studies in Los Angeles and in Massachusetts conclude that no significant differences existed among the height groups tested and that height did not seem to be significantly related to patrolman effectiveness. *See* Height Standards in Police Employment and the Question of Sex Discrimination: The Availability of Two Defenses for a Neutral Employment Policy Found Discriminatory Under Title VII, 47 Southern California L.Rev. 585, 608–614 (1974).

**13.** Plaintiffs failed to assert any claim under Title VII even though § 2000e(a) was amended in 1972 to bring government, governmental agencies and political subdivisions within Title VII. Pub.L. No. 88–352, 78 Stat. 253. *See* 520 F.2d at 493 n. 3.

**14.** The Supreme Court denied certiorari on the violation of the equal protection "reasonableness" standard asserted in the plaintiff's petition. 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976), *reh. denied*, 429 U.S. 933, 97 S.Ct. 341, 50 L.Ed.2d 303 (1977).

to violate Title VII]; *Hardy v. Stumpf,* 37 Cal.App.3d 958, 112 Cal.Rptr. 739 (1974) [5′7″ patrolman requirement found to violate Title VII]. *See also* Annot., 29 A.L.R. Fed. 792 (1976).

Two additional rulings lend further support for invalidation of minimum height requirements. In *United States v. City of Chicago,* 411 F.Supp. 218, 230–231 (N.D.Ill. 1976), the district court ruled that the 5′4″ minimum height rule for police officers fell within the scope of the court injunction prohibiting discrimination against women under Title VII. Furthermore, the Equal Employment Opportunity Commission in a 1973 decision found that a 5′7″ minimum height requirement for firefighters discriminated against both women and SSAs in violation of Title VII. EEOC Decision No. 74–25, CCH EEOC Decisions ¶ 6400 (1973).

█ Based upon the legal standards provided under Title VII as interpreted by the courts and by the EEOC, this court finds that the defendants have failed to introduce sufficient justification for the disproportionate impact upon women and SSAs caused by the use of minimum height requirements. No showing of business necessity through any professional validation study has been provided to the court. Absent such proof the court must find the minimum height standards required by both the Buffalo Police and Fire Department to be in violation of Title VII.

## B. *NEW MPTC STANDARDS*

█ In 1974 the New York State MPTC abandoned minimum height standards for police applicants in favor of height, weight, and physical agility tests to be required of all applicants. The Government has challenged this test under Title VII as giving undue advantage to persons of greater height.

Under the current MPTC standards, each applicant, male and female, must achieve a minimum composite score of 150 points in order to qualify for the eligibility list. These points are obtained by multiplying the numerical score assigned to height, weight, and body frame, against the physical fitness score. If a person falls within the proper weight range for height and frame provided in the table used, he/she will be awarded a numerical score. Men 5′9″ or taller will receive the maximum score of 100 points. They lose 20 points for each inch in height below 5′9″. On the other hand, women will receive 100 points if they are 5′4″ in height or above. They also lose 20 points for each inch below that figure. *See* MPTC Standards at 3a. The physical fitness test includes tests for agility, strength, speed, and endurance. A weighted score of 4–10 points is assigned based upon the totals from these tests. *See* MPTC Standards at 13a.

The final total score is then compiled by multiplying the points from the height/weight table against the physical fitness screening test score. For example, a man 5′8″ in height who weighs 135 pounds will have a score of 80 points to be multiplied by his fitness score. If he receives a score of 6 points, his total score would be 480 points.

The Government has challenged the advantage given to height in the tables as discriminating against SSA males. It also attacks the type of tests used in the physical fitness tests as being arbitrary and weighted against women. Finally, it points out that none of these standards have been validated as job related. These claims will be examined individually.

First, the Government claims that the height/weight scoring chart is unfairly slanted to favor tall individuals. A non-SSA male of average height would receive a weighted score of 100, while a SSA male of average height would receive a score of only 60. Party Admission, Pl.Ex. 8, ¶ 41. This score is then combined with the fitness test score to determine if a candidate will pass. Although a score of 150 is sufficient to pass the test, candidates will be ranked for eligibility according to their raw score. Thus, a male 5′7″ tall must score significantly higher on the physical fitness test than a male 5′10″ tall in order to achieve the same score.

Next, the Government has introduced the testimony of an expert witness, Dr. Lawrence Golding, professor and research director in exercise physiology at Kent State University. In reviewing the height/weight scoring component, he pointed out that it is unduly weighted toward the height factor since the scoring number from height is so much larger than that from fitness (Tr. 596). Furthermore, he criticized the physical fitness aspect of the test since it lacks any test for cardiovascular endurance or for flexibility (Tr. 576, 590). These have been established in recent years as crucial indicators of physical fitness (Tr. 577, 582).

Finally, defendants have admitted that no attempt has ever been made to validate the MPTC height, weight, and physical fitness standards in accordance with EEOC Guidelines on Employee Selection Procedures, 29 C.F.R. §§ 1607.1 et seq. See MPTC Standards at i-ii.

The court finds that the efforts of the MPTC in developing new height and weight standards has reduced the discrimination imposed on women by the minimum height standards. In adopting the new tests the Council is moving closer to an equitable physical selection procedure. Nevertheless, the test still is discriminatory in that it places far too much emphasis on height in the scoring composition. This has the effect of eliminating SSA applicants. In addition, the Government has raised significant doubt about the absence of cardiovascular and flexibility tests in the fitness component. The current test tends to concentrate on forms of strength and agility which are less developed in women and shorter people in general. Expert testimony questions the validity of the test as a measure of general fitness under the current standards followed by experts in the field.

This court does not possess the expertise to rule conclusively on the scoring system to be used for ranking applicants nor on the type of exercise to be included in testing physical agility. Nevertheless, it must determine if the MPTC standards meet statutory requirements. In this instance the Government has shown a prima facie discriminatory impact through the present selection system. It has furthermore raised substantial doubt about the effect of the newly developed standards. The only way to resolve the doubts concerning the new MPTC standards is to have them validated as job related. Since no attempts at professional validation of either the former or current tests have been made, the court must find them invalid under Title VII standards.[15]

IV. *HIGH SCHOOL DIPLOMA REQUIREMENT*

■ In addition to the age, height, weight, and vision requirements, an applicant for either the police or fire departments must possess a high school diploma or equivalency diploma. The Government challenges this requirement as another violation of Title VII.

To establish a prima facie case of discrimination, the Government cites figures which state that of persons 25 years and older in the City of Buffalo, 30.4% of blacks and 17.5% of SSAs have a high school education as compared to 41.0% of the Caucasians.[16] While these figures alone do not present a strong prima facie case of disproportionate impact, when coupled with the other evidence presented by the Government, I find that they are sufficient to shift the burden of proof to the defendants to validate the requirement as job related under *Griggs, supra*. It should be noted carefully, however, that the Supreme Court has found the EEOC Guidelines to be applicable to tests only and not to the high school diploma

---

**15.** The use of the MPTC Standards without validation may also constitute a violation of the LEAA Guidelines, but insufficient proof has been presented to the court in this regard. It therefore seems this matter is best left to administrative enforcement by the Justice Department.

**16.** 1970 United States Census, PC(1)–C(34) (New York—Tables 83, 91, 97).

requirement under 42 U.S.C. § 2000e–2(h). See *Griggs, supra* 401 U.S. at 433 n. 8, 91 S.Ct. 849. Therefore the standard to be applied here is not as rigid as that required for tests.

In the patrolman case, I find that the requirement has been validated by a "meaningful study of their relationship. to job-performance ability" as required by *Griggs.* 401 U.S. at 431, 91 S.Ct. at 853. I refer to the 1967 report of the President's Commission on Law Enforcement and Administration of Justice, "The Challenge of Crime in a Free Society," at 106–110, its underlying "Task Force Report: The Police," at 126–128, and the subsequent 1968 "Report of the National Advisory Commission on Civil Disorders," at 166. The level of education required for police officers was a central concern of these reports. The conclusion which they reached is that a high school education is a bare minimum requirement for successful performance of the policeman's responsibilities. This reasoning has been followed by several courts to uphold the high school requirement. *See Castro v. Beecher,* 459 F.2d 725, 735 (1st Cir. 1972); *Arnold v. Ballard,* 390 F.Supp. 723 (N.D.Ohio 1975); *League of United Latin American Citizens v. Santa Ana, supra* at 901; *see also* Annot., 30 A.L.R.Fed. § 11(e) at 303 (1976). I find the reports and the cases cited to be ample support for continuation of the diploma requirement for police patrolmen.

■ Turning to the high school diploma requirement for the position of firefighter, the court finds a different state of affairs. Here the defendants offer no evidence to justify the requirement for the Buffalo Fire Department to meet the *Griggs* standard. Furthermore, judicial precedent exists to overturn the requirement. In *Dozier v. Chupka,* 395 F.Supp. 836 (S.D.Ohio 1975), the court found no relation between the diploma and job performance as a firefighter. Similarly, in *Santa Ana, supra,* the court found such a requirement too broad to meet the sole job related need, that of a 12th grade reading ability in order to understand firefighting training manuals.

Since the Government has met its burden to show prima facie disproportionate impact while the defendants have shown no need for the educational requirement, this court must conclude that the high school diploma requirement for firefighters violates Title VII.

## V. *SEX DISCRIMINATION*

The parties in this action have stipulated to the facts concerning the hiring of women for the positions of patrolman, police cadet and firefighter. At completion of trial, there had never been a single woman patrolman, cadet or firefighter. (Party admission, Pl.Ex. 17, ¶ 67). Furthermore, not a single woman was on the eligibility lists for any of these positions. *Id.* ¶¶ 70, 71. No attempt had ever been made to recruit women for these positions. *Id.* ¶ 72.

■ Under Title VII the purpose of the sex discrimination provisions is to eliminate disparate treatment of female employees and to provide equal access to the job market for both men and women. The Act rejects the notion of "romantic paternalism" towards women and seeks to put them on an equal footing with men. *Rosen v. Public Service Electric & Gas Co.,* 328 F.Supp. 454 (D.C.N.J.1970); *see also Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *cf. Frontiero v. Richardson,* 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). In enacting the prohibition against discrimination based on sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes. *Sprogis v. United Airlines, Inc.,* 444 F.2d 1194 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); *see also Rosenfeld v. Southern Pacific Co.,* 444 F.2d 1219 (9th Cir. 1971); Annot., 12 A.L.R.Fed. § 15 (1972).

■ Title VII provides a standard for hiring which, although not absolute, places stringent demands upon an employer. In order to discriminate lawfully on the basis of sex, an employer must show that sex is a

bona fide occupational qualification [bfoq] reasonably necessary to the operation of that employer's business. 42 U.S.C. § 2000e–2(e); *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). Numerous court decisions have recognized that the bfoq exception must be narrowly construed. *See Dothard v. Rawlinson, supra* at 334, 97 S.Ct. 2720; *Diaz, supra;* Annot., 12 A.L.R.Fed. § 6(b) *at* 39.

To sustain this burden, the defendant employer must show that the jobs in question have requirements which make it impossible for all or substantially all women to perform them satisfactorily. *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711 (7th Cir. 1969); *Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228 (5th Cir. 1969); *see also* EEOC Guidelines on Sex as a Bona Fide Occupational Qualification, 29 C.F.R. §§ 1604 *et seq.*

The standards for determining the legality of selection standards are the same in cases involving sex discrimination as in those involving race discrimination. *Wetzel v. Liberty Mutual Ins. Co.,* 511 F.2d 199 (3d Cir. 1975), *cert. denied,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1975). This again involves the establishment of a prima facie case by the plaintiff which shifts the burden of persuasion to the defendants.

Looking to the evidence presented in this case, we find not only a prima facie case of sex discrimination but an absolute bar to the hiring of women for the positions in question by both the Buffalo Police and Fire Departments. Defendants present no evidence to establish a bfoq which would justify this absolute bar. Plaintiff, on the other hand, has provided the court with substantial evidentiary materials in the form of statistical studies and job evaluations which demonstrate the ability of women to act as patrolmen and firefighters,[17] as well as their current active status in these positions in other police and fire departments throughout the United States.[18] Furthermore, they demonstrate the existence of a large qualified pool of women in the Buffalo area who have shown an interest in this field of work.[19]

The only defense offered by the defendant Police Department for such blatant discrimination is the existence prior to its repeal in 1974 of the New York statutory bar to police patrolwomen. N.Y. Civil Service Law § 58 (McKinney's 1973). The Fire Department has presented no defense.

This court finds that both the Police and Fire Departments have failed to show the necessary bfoq to justify their total failure to hire women for the positions of patrol officer and firefighter. Section 58 of the New York Civil Service Law barring women from police patrol work has been repealed and no longer has any effect.[20]

---

**17.** Pl.Ex. 10; P. Bloch and D. Anderson, Policewoman on Patrol: Final Report (The Police Foundation, Washington, D. C.) [Draft Copy]. This study of 86 male and 86 female patrol officers in Washington, D. C. concludes that sex is not a legitimate occupational qualification for patrol work.

Performance ratings for both men and women were comparable, while patrolwomen were found to provide certain advantages. They may improve Department relations with the community, and are less likely to become involved in serious unbecoming conduct.

**18.** Pl.Ex. 42; B. Washington, Deployment of Female Police Officers in the United States (International Association of Chiefs of Police and the Police Foundation) 1974.

According to this survey at least 116 law enforcement agencies in the United States utilize female officers on patrol while 30 more plan such programs. *Id.* at 2. Cities with populations comparable to Buffalo's which de-

ploy female officers on patrol include Louisville, Kentucky; St. Louis, Missouri; Portland, Oregon, and a number of others. *Id.* at 13. New York City has 414 female officers on patrol. *Id.* at 30.

**19.** The Department of Criminal Justice of the State University of New York at Buffalo has graduated over 100 females since 1969. In 1975, another 98 women were enrolled in the department, in addition to several members of the Police Department (Tr. 426–427).

**20.** Although a consideration of the legal validity of N.Y. Civil Service Law § 58 is moot due to its repeal in 1974, it does have some bearing on the long term pattern of discrimination against women and the relief to be granted. It should be noted that under 42 U.S.C. §§ 2000e–7 and 2000h–4 any provision of state law which is inconsistent with the purpose or any provision of the Act may be deemed invalid. A number

Therefore, both departments are held to have violated Title VII provisions regarding sex discrimination.[21]

## VI. TERMS AND CONDITIONS OF EMPLOYMENT

The Government also alleges that, in addition to discrimination in selection procedures, the Buffalo Police and Fire Departments have discriminated against black patrolmen and firefighters in the terms and conditions of their employment.

As pointed out previously, a pattern or practice of discrimination is established when discriminatory acts are found not to be isolated, peculiar or accidental. *Teamsters v. United States, supra* 431 U.S. at 336 n. 20, 97 S.Ct. 1843; *United States v. Ironworkers Local 86*, 443 F.2d 544, 552 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). Furthermore, evidence of past acts may be introduced to show present intent and effect as well as to determine appropriate relief.

The language of § 2000e–2(a)(1) evinces a congressional intention to define discrimination in the broadest possible terms. Instead of enumerating specific discriminatory practices it chose a broad standard covering "terms, conditions or privileges" to cope with the wide range of practices which might lead to employment discrimination.

[T]oday employment discrimination is a far more complex and pervasive phenomenon, as the nuances and subtleties of discriminatory employment practices are no longer confined to bread and butter issues. . . .

We must be acutely conscious of the fact that Title VII of the Civil Rights Act of 1964 should be accorded a liberal interpretation in order to effectuate the purpose of Congress to eliminate the inconvenience, unfairness, and humiliation of ethnic discrimination. [citations omitted]. *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

[29] Furthermore, a variety of employment practices which are related not to economic fringe benefits but to intangibles, such as psychological impact upon minority employees from a work environment heavily charged with discrimination, fall within the protection of the expansive statutory language. *See Rogers, supra* at 238. Such practices have been found to conflict with Title VII in a number of cases. *See, e. g., United States v. City of St. Louis*, 549 F.2d 506, 514 (8th Cir. 1977), *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977) [exclusion of blacks from informal "supper clubs" in firehouses]; *Gray v. Greyhound Lines, East*, 178 U.S.App.D.C. 91, 98, 545 F.2d 169, 176 (1976) [potential psychological impact upon black employee due to improper restriction on number of black employees and resulting arbitrary treatment]; *Barnes v. Costle*, 183 U.S.App.D.C. 90, 101, 561 F.2d 983, 994 (1977) [job termination due to rejection of employer's sexual advances]; *Harrington v. Vandalia-Butler Bd. of Ed.*, 418 F.Supp. 603, 606 (S.D.Ohio 1976) [inferior work conditions and treatment of female physical education instructor].

In my review of the practices revealed by the evidence at trial I must evaluate the overall work environment in light of the intent shown by Congress to establish a strong stand against all forms of employment discrimination.

---

of courts have read the two above provisions together to invalidate conflicting state provisions. *See, e. g., LeBlanc v. Southern Bell Tel. & Tel. Co.*, 333 F.Supp. 602 (D.La.1971) [held that where Title VII occupies field conflicting state statute was invalid under the supremacy clause of the United States Constitution]; *Ridinger v. General Motors Corp.*, 325 F.Supp. 1089 (D.Ohio 1971) [Ohio statutes prohibiting women from holding certain jobs held invalid since they conflicted with Title VII]; *see also* Annot., 12 A.L.R.Fed. § 5(c) at 36. Therefore, in a case such as this where a total ban on the hiring of women as patrol officers was legislated by the state, it is highly doubtful that the statute would withstand legal attack under Title VII. As such, it presents a weak defense for past practices by the Buffalo Police Department.

21. Since the Government pursued its claim of sex discrimination as a violation of Title VII and not as an equal protection violation, I will refrain from a ruling on the latter claim. This will have no effect on any remedial orders.

## A. *WORK ENVIRONMENT*

■ A number of incidents of discrimination against black police officers have been raised by the Government. In determining whether these constitute a pattern of discrimination I have considered separately those cases in which investigations were undertaken by order of the commissioner, those in which only precinct officials were aware of the situation, those which reflect upon the racial environment although no complaint was made, and those in which no clear determination can be reached as to whether discriminatory action took place.

According to the Police Department a system for handling complaints against police officers is set forth in the Department's Manual of Procedure (Tr. 951). All complaints made through this system are supposed to be investigated (Tr. 968–969). The Commissioner also contended at trial that any problem raised by communication with his office would receive attention (Tr. 949). Reviewing those incidents where an investigation was made I find that, in several cases, serious questions have been raised by the Government concerning the adequacy of the Commissioner's actions.

1. In 1971 at Precinct 12, a black patrolman witnessed a white police officer beating a black suspect with a blackjack while placing him in a cell (Tr. 414–415). After the black patrolman filed a report the Police Department preferred charges against the white officer (Def.Ex. 12), but when the victim dropped his charges against the officer, which were pending in City Court, the Department investigation was also terminated (Tr. 964–968, 989–990). Review of the transcript and of the investigation file indicate that two officers saw the beating and that the guilty officer himself admits the action—although he claims to have been provoked. Despite this unrebutted evidence of the occurrence the Department allowed the matter to remain unresolved for nearly two years until, in March 1973, departmental charges were dropped upon the deputy commissioner's recommendation. His reason for dropping the charges was that a public hearing on the matter would expose the Department to public ridicule (Def.Ex. 12).

A second incident took place on April 17, 1972 when two black patrolmen were harassed by white officers while sitting in a friend's car near a fast food takeout restaurant during their off-duty hours. The two white patrolmen claimed to find the car suspicious so they came alongside, shined a flashlight into the face of one of the black officers and began asking questions while keeping them pinned in the car. After both were able to push their way out, one of the white patrolmen tried to keep one of the black patrolmen from going into the stand to pick up his food order. Finally, a police lieutenant arrived who identified the two black police officers and ended the confrontation. Since the black officers had been on the force for twelve and fifteen years respectively and had often seen the other officers at Precinct 4, it is difficult to understand how this incident came about. Nevertheless, after the black officers filed reports and affidavits (Def.Ex. 4), no action was taken.

Another incident arose involving the members of the all-black Police Enforcement Patrol [PEP Squad] on July 2, 1971. That evening the squad members took a meal break in the reserve room at Precinct 4 to have a pizza. The lieutenant on duty entered the room and ordered them to leave the station. In the process the lieutenant called the group a bunch of "Uncle Toms" and said: "they are going to get you, they hate your guts." He also apparently maligned them in strong language for their work in the Talbert Mall, a black area. The squad returned to the precinct station with their supervisor, a detective sergeant, having been instructed by their captain to wait there. While waiting, they were again approached by the lieutenant who again ordered them out of his station. A short time later, the captain and the deputy commissioner arrived and spoke with the lieutenant for several minutes. The men were then ordered to return to Precinct 6. A report was filed by the black officers but no

record of any further action by the Department has been introduced (Tr. 115–127; Def.Ex. 8).

From the evidence introduced at trial it is not clear whether the members of the PEP Squad should have taken their lunch break at Precinct 4 or whether they violated any other Department rule. Nevertheless, it is apparent that they were treated much differently than white officers would have been. They were insulted by the lieutenant and the matter was not resolved until the deputy commissioner came on the scene. Furthermore, nothing was done thereafter to respond to the reports filed by the black officers.

2. The second group of incidents involve cases where problems were brought to the attention of precinct captains who then failed to bring these to the commissioner's attention or to take action on their own.

On several occasions at the Tactical Police Unit office [TPU], racially derogatory material was displayed on the bulletin board. This includes material posted in December, 1970 (Pl.Ex. 30) and in early 1971 (Pl.Ex. 31; Tr. 233–36). A black patrolman showed these articles to the captain and the lieutenant but no action ever resulted. In 1974 on the TPU bulletin board a drawing of a horse with a hooded rider and the inscription "The KKK is Still Alive" appeared (Tr. 218–19). Again the captain was informed of the presence of this picture but nothing happened.

A number of instances have also been cited where black patrolmen have been harassed or threatened through use of the mails. In 1974 a black patrolman received an envelope sent through Department channels which contained a sheet of paper with a picture of a horse with a hooded rider and the inscription "The KKK is Still Alive" (Tr. 215–16). When confronted with this information, the precinct captain stated his disapproval and said he would talk to the men in the precinct (Tr. 216, 218, 221).

Another black patrolman received a Police Department death report containing his name and numerous racial comments (Pl.Ex. 27) while working at Precinct 12 (Tr. 312–15). The report was shown to the captain but apparently no action was taken.

Sometimes the writing of statements was not confined to the mails. In 1971 while at Precinct 6, a black patrolman found the statement "We don't want any niggers in this department" on his locker (Tr. 303, 307–308). He informed the lieutenant of this statement but, again, it does not appear that any action was taken.

Another situation further establishes the Police Department's lack of concern in dealing with racial problems both in the community and within the police force itself. In 1968, at about the time of Dr. Martin Luther King's assassination, several citizens complained to black officers about white officers wearing "Wallace for President" buttons on their uniforms while on duty in the black community. Three black officers reported this violation of Department regulations to their superiors. Shortly thereafter, two of the three black officers were transferred from their patrol car to walking a beat in another precinct (Tr. 106–111, 236–37).

3. A substantial number of additional occurrences have been uncovered where no official complaint was made either to the commissioner or to the precinct captain. While it is true that in most of the following instances the evidence is not corroborated, I have observed the witnesses at trial and find no reason not to accept their testimony as true. Furthermore, because of the number of cases involving black officers which went uninvestigated or where action was taken against a complaining black officer, it is understandable why the officers who testified about the following incidents did not bring formal complaints to their superior officers. In cases such as these, due consideration must be given to the witness's perception of what would result from lodging a complaint, so long as that perception has some factual basis.

In Spring 1971, a black police cadet saw a white police officer ram a black female prisoner's head into the wall at Precinct 3. He did not report the incident because he

had been advised by the supervising white police cadet that to do so would result in him losing his job (Tr. 458–461).

Several years later, in 1974 at Precinct 8, the same black patrolman received a police envelope containing racially derogatory literature and a "free ticket to Africa" (Tr. 462–464, 466). Although he intended to send a complaint to the commissioner, he claims that he was prevented from doing so because the incriminating material was stolen from his locker (Tr. 463).

At Precinct 8 newspaper clippings with derogatory notations directed at black people appeared on the bulletin boards on numerous occasions (Tr. 230–31). No black patrolman complained about these clippings because they perceived that the precinct officers would not listen to such complaints (Tr. 231).

In December, 1974 a poster was found in the reserve room at Precinct 8 with the inscription "Smash Black Scum" (Tr. 466–70, 994–98). In this case the only action taken was in the form of an apology to one of the precinct's black patrolman.

In November, 1974 at Precinct 12 a cartoon and a Department communication form (P–73) which contained racial comments about a complaint filed by the stepson of a black policeman were displayed on the bulletin board (Tr. 149–56; Pl.Ex. 25).

Earlier, in 1967 on the Precinct 4 bulletin board, a picture of Dr. Martin Luther King and his family labeled "a bunch of niggers" was posted and remained for over one week in public view in a predominantly black neighborhood (Tr. 127–128, 370–71). Again in 1967, at Precinct 6, a picture of Dr. King was placed in the locker room with a hole in his head and a live bullet inserted in the hole (Tr. 127–29).

A number of incidents have also been cited by the Government where black police officers were subject to abuse over the police radio system. In the summer of 1971, the all-black PEP Squad received calls over their police radios prefaced by the following greeting, "Where are the niggers who are in the nigger car tonight?" (Tr. 130). Trial testimony was received to the effect that the use of the term "nigger" has been used over the police radio as recently as February, 1974 (Tr. 130–31, 473). In March, 1975 the highest ranking black officer in the Police Department received the following response over police radio upon calling for a car to pick up a drunk, "You're a policeman, Captain, why don't you take care of it?" (Tr. 371). None of the above incidents were reported to the commissioner's office, ostensibly because of the perception that nothing would be done.

4. To complete the record, the Government has also reported several additional incidents which, after careful review, I find to be inconclusive in reaching a determination as to a pattern or practice of discrimination.

The first of these arose on March 15, 1972 involving a black Community Peace Officer and a white lieutenant. The black officer claims to have been struck by the lieutenant and placed under arrest (Tr. 21–50, 952–53). An investigation record was compiled (Def.Ex. 6), after which the black officer received a reprimand which went into his record. I find from the record that the black officer clearly violated a number of Department regulations in his conduct and has not established a claim of discriminatory treatment.

Another black patrolman was involved in several incidents reported by the Government. On October 12, 1972 at Precinct 12, he became involved in a controversy with another white patrolman over the use of the Precinct telephone by the mother of a young black man who had just been arrested (Tr. 258–262). Allegedly, profane language and obscene gestures were used by both officers. The Department recommendation to transfer both officers (Def.Ex. 7) was followed by the commissioner sometime thereafter (Tr. 957). In addition, the same black patrolman had a shoving match with a white lieutenant regarding the removal of two black men from Precinct 8 on June 18, 1971 (Tr. 241). After investigation (Def.Ex. 9) it was decided by the commissioner to take no disciplinary action. I find that

substantial question exists as to who actually instigated the pushing between the two officers and therefore find no discriminatory treatment in the Department's handling of this situation.

The Government has also introduced evidence that between 1968 and 1973 the highest ranking black officer in the Department and the commander of Precinct 6 requested that at least 25 white officers be transferred out of Precinct 6 because, in his estimation, they could not work compatibly with black people in a black situation. All of these officers were subsequently transferred to other precincts but still served the black areas of Buffalo (Tr. 392–93). I can find no actionable discrimination here since the officers were transferred from the captain's precinct. Yet, viewed in context, this shows a lack of attention to the problems of racial tension in the community since no steps were taken to sensitize the transferred officers to the needs of the community which they continued to serve.

Although many of the situations cited by the Government took place a number of years ago and all of the evidence in the case has been closed for several years, the court cannot overlook the gravity of the incidents revealed. The number of such situations, the openness with which they took place, and the seemingly indifferent response of Department authorities support a finding of a pattern or practice of unequal conditions of employment for black police officers throughout the Department in violation of Title VII.

The commissioner's office shows some evidence that it investigated certain racial incidents, yet, in many of these incidents it failed either to conduct a full investigation or to take action upon completion of the investigation. The prisoner beating incident, in particular, demonstrates a shocking failure to engage in appropriate internal discipline.

Similarly, the failure of precinct officers to take immediate action on racial complaints demonstrates an insensitivity to the need for all officers, of whatever race, to have the opportunity for prompt and just redress of grievances.

Finally, the numerous incidents of racial slurs and harassment of black officers uncover a working environment heavily charged with racial discrimination. Racial slurs transmitted over police radio present an even more severe problem than printed or oral slurs since they can be picked up by receivers throughout the Department as well as by other members of the community.

The commissioner has the duty to closely monitor all radio correspondence so that any violation will be recognized and punished. He is aided in this duty by his communications staff and by the tape record of communications which is maintained by the Department. The commissioner has issued departmental regulations on radio use (Def.Ex. 14), but it does not appear that these have been enforced in racial matters. Certainly it can be expected that had the remark cited above regarding the black police captain been made to a white officer, immediate action would have been taken. No less protection should be afforded black officers.

The Department has hidden behind a paper policy of racial tolerance. It has stated that if the complaints brought out at this trial had been brought to the commissioner, action would have been taken. The record speaks otherwise. A strong policy directive should have been issued by the commissioner on racial tolerance, it should have been constantly impressed upon the entire force, particularly precinct and unit leaders, and a formal mechanism should have been established to deal with any related grievances.

The court recognizes that the evidence presented at trial reflects the situation several years ago and does not purport to describe the current status of race relations in the Department. For this reason the court will also take the current situation into account in fashioning a remedial order.

### B. *ASSIGNMENTS*

The Government has also attempted to establish a pattern or practice of

discrimination in the assignment of minority employees in both the Police and Fire Departments.

In the Police Department testimony indicated that in the 1960s and early 1970s most black patrolmen were discriminatorily assigned to walk a beat and generally were not permitted to ride in patrol cars (Tr. 99–102; 310–311; 365–368). No evidence has been introduced which successfully rebuts this contention that black patrolmen were treated differently than white patrolmen.

Some evidence was also introduced to attempt to demonstrate that blacks had been kept out of the motorcycle unit of the Traffic Division (Tr. 102–103; 369–370). However, evidence introduced by the defendants indicates that positions in the motorcycle unit had been substantially cut back in recent years and that no vacancies existed. At the time of trial a black patrolman headed the waiting list for new appointment (Tr. 946–948).

Based on the evidence before me, I find sufficient evidence to establish a Department practice of discrimination in placing black officers in "walking" assignments but not in the denial of appointments to the motorcycle unit.

■ In the Fire Department case, testimony has been introduced regarding the assignment of all black firefighters to Engine 21 and adjoining Ladder 6 or to Engine 3 and adjoining Ladder 3 (Tr. 507; 534–535). However, testimony has also been introduced which establishes that, at least in recent years, transfers out of these stations by seniority have been permitted and that no black firefighters have been denied this opportunity (Tr. 508; 1008–1009).

In addition, testimony has been introduced that in years past, particularly in the 1950s and early 1960s, black firefighters were assigned to beds segregated from white beds (Tr. 488; 533–34). Further testimony shows that this practice was no longer followed at the time this trial commenced (Tr. 517; 534).

Based on the evidence,[22] I find no pattern or practice of discrimination in assignments within the Fire Department.

### C. *INDIVIDUAL CLAIMS OF DISCRIMINATION*

■ Evidence of several individual cases of racial discrimination regarding appointment, discharge, and equal pay has been introduced by the Government. The legal standard to be applied to these individual cases is the same applied to the other elements of this suit, namely, discrimination against an employee must be found to be due to his race under Title VII or to intentional racial discrimination under § 1981 or § 1983. A prima facie case must be established in each case at which time the burden of persuasion shifts to the defendants. The court will examine the facts involved in each of these cases to determine whether a claim for relief may be upheld.

The first of these claims is that Jerry Stover, Jr. was passed over for appointment as a police cadet despite his place on the eligibility list. As a result, he was forced to wait for eight months while unemployed until he was finally given an appointment.

Mr. Stover was originally granted provisional status as a police cadet when no eligibility list was in existence and the Department needed to fill the position. Stover failed the cadet exam on June 27, 1970, thereby losing his provisional status. However, he was reappointed as a provisional cadet in February, 1971 and passed the June, 1971 cadet exam placing 75th on the eligibility list. In December, 1972 the Police Commissioner requested names from the Civil Service Commission to fill ten cadet vacancies. A list of twelve names was submitted, as required, with Stover ranked seventh. Yet Stover was passed over for the job while a nephew of the Police Commissioner, who had ranked eleventh, was included among those chosen.

---

**22.** It should be noted that from 1966 to 1972 the Buffalo Fire Department Commissioner was a black man. The firefighters who testified at trial admitted his beneficial influence upon racial relations within the Department (Tr. 503).

Defendants argue that Stover had a skin condition problem at that time which made his appointment questionable. He was told by the commissioner that if he could get approval from a doctor he would be given a position. The Government, however, points out that Stover had already been approved by two doctors. It contends that further medical examination was unwarranted and served only to delay Stover's deserved appointment.

The coincidence of Mr. Stover's referral to the doctor for further examination with the appointment of the then current Police Commissioner's nephew in his place, despite the latter's lower ranking on the eligibility list, raises a substantial claim of discrimination. Although some question of Mr. Stover's skin condition existed, he had previously been examined and approved by Dr. Robert Sullivan, the Civil Service doctor. Furthermore, he had already served a considerable length of time as a provisional police cadet without problem. Therefore, even if I were to concede that doubt remained as to his condition, I find that the appropriate alternative would have been to provide Mr. Stover with an immediate physical examination prior to selection from the list. The failure to grant the appointment gives rise to a finding of a violation of Mr. Stover's rights under Title VII. I do not, however, find sufficient evidence to establish the discriminatory intent required under § 1981 or § 1983.

■ The second case involves Norman Green, who was a provisional police cadet while finishing his senior year in high school in 1971. During the ten days that he was assigned to Precinct 12, Green stated that he had been harassed by other police officers (Tr. 82–92). Patrolmen brought acquaintances of Green to the stationhouse and said that Green had "squealed" on them. This caused him difficulty when he later encountered these acquaintances at school. Officers also pointed loaded guns at him on one occasion after target practice. Green claims to have requested a transfer to another precinct in writing to the precinct captain and in a meeting with the

Civil Service Board. Instead, he was terminated.

Defendants claim that Green had actually asked to be terminated, not transferred. William Cleary, Administrative Director of the Buffalo Civil Service Commission, testified that he did not recall any mention of the harassment described above at the Civil Service Commissioners' meeting with Green, but only a discussion of a conflict between Green's work hours and his school basketball schedule (Tr. 904–5). He further stated that Green freely resigned from his position despite the commissioners' advice to stay with the Department.

In this case the court is hampered by the lack of a complete record. The actual written request made by Green has not been placed in evidence. As a result the court must rely upon the conflicting testimony of Mr. Cleary and that of Green himself. While the claim of harassment is indeed a serious one, no corroborating evidence exists to support it. Therefore, although the court might question the commissioners' failure to investigate Green's claims, the evidence is insufficient to find any constitutional or statutory violation.

■ The next case involves a claim for acting pay by Charles Medley, who served from 1971 to 1973 on the PEP Squad, a special unit of ten men who patrolled several areas in the black community in order to reduce street crime and keep peace during a difficult period of racial unrest (Tr. 115–118). It was under the direction of a captain and headed by a detective sergeant (Tr. 118, 143).

Medley claims essentially that when the sergeant was not on duty, he became recognized squad supervisor by seniority. Since other squad officers received "acting" pay (Pl.Ex. 3, at 45), Medley requested such pay on February 20, 1973, but never received any response (Pl.Ex. 36; Tr. 418–419).

The collective bargaining agreement has a grievance procedure to handle claims of contract violation (Pl.Ex. 3, Appx.). Defendants claim that since Medley never properly filed a grievance with the BPBA

(Tr. 421), he cannot now claim to be a victim of discrimination. Furthermore, under the collective bargaining agreement, acting pay is authorized only when the claimant has actually replaced a higher officer (Tr. 882). Here defendant contends that the PEP Squad was under the day-to-day direction of a patrolman (Tr. 378), not a lieutenant (Tr. 972). Therefore, since Charles Medley did not act in the place of a lieutenant, he should not be eligible for such pay.

According to the deposition of Commissioner Blair, squad leaders were frequently not lieutenants but detective sergeants (Pl.Ex. 3, at 45). Furthermore, it should be noted that the salary of a detective sergeant is substantially higher than that of a patrolman (Pl.Ex. 3, at 45). Therefore, someone replacing a detective sergeant as acting squad leader would seem to be entitled to acting pay.

Officer Medley's claim is based upon his substitution for a detective sergeant when the latter was not on duty (Tr. 144, 394–5, 417–8). According to Medley this includes approximately 180 hours of duty (Pl.Ex. 36). Under the collective bargaining agreement, it can be argued that acting pay should be provided in such instances (Pl.Ex. 3, Appx. art XVII).

As for the failure to file a grievance with the BPBA, the court finds that other factors must be taken into account. First, Medley filed a formal communication with the commissioner's office requesting acting pay which had been approved and signed by his captain. He received absolutely no response, and now the commissioner's office has been unable to locate the communication. Second, it appears from the record that the Police Department was not fully in conformance with the acting pay arrangement since the BPBA was forced at that time to go to arbitration on eight similar requests, six of which were approved by the arbitrator. Since the question of the adequacy of BPBA representation of black police officers is a major issue in this lawsuit, it is not surprising that Mr. Medley did not follow the grievance route.

I find that the defendants have failed to rebut Officer Medley's prima facie showing that he is entitled to acting pay. They have not shown any contract term or Department policy which would foreclose Medley from such pay. Therefore, by a preponderance of the evidence, Medley has proved a violation of Title VII.

■ The Government has also presented testimony regarding the alleged discriminatory treatment of two black firefighters (Tr. 531–544). Based upon trial evidence, however, I find that in both cases neither a constitutional nor a Title VII violation has been established.

One firefighter claims that he was passed over for the position of driver, but the evidence clearly shows that he was incapable of driving responsibly (Tr. 495–500; 870–872). He also claims that his position as an acting lieutenant was taken away from him discriminatorily, but evidence shows that it was the result of his persistent failure to report to duty on time (Tr. 930–938).

The other claims that he was relieved from a position as acting lieutenant discriminatorily, but evidence shows that he also had a problem with late reporting for work and his grievance was denied (Tr. 531–544; 942).

## VII. BUFFALO POLICE BENEVOLENT ASSOCIATION

The BPBA is a non-profit corporation which represents police department employees as their collective bargaining agent in negotiations with the City of Buffalo. It is a labor organization under 42 U.S.C. § 2000e(d) and in a business which affects commerce under 42 U.S.C. § 2000e(e). While the BPBA has a vital interest in the issues raised by this suit, it presented no direct evidence and took nor formal role in cross-examination of witnesses.

At the time of trial, the BPBA was composed of a board of five officers and approximately fifty delegates. Not one of these fifty-five persons was black (Tr. 263, 890–891). Furthermore, the uncontradicted

testimony of black officers indicated their serious lack of confidence in the ability of the BPBA to deal with racial problems (Tr. 160–162, 263–270, 315–317, 347–348). In addition, they perceived the BPBA as anti-black and opposed to the entry of minorities into the Department (Tr. 160–62, 315–17). Support for this perception is found in the reported statement of a former president of the BPBA, in refusing to file a grievance for a black officer, that the blacks were the cause of all the trouble in the city because they had formed their own Afro-American Police Association and that if they did not like his representation, they should get out of the union (Tr. 316–317).

■ Although the law on union liability for Title VII discrimination has been altered considerably by the Supreme Court's grant of immunity to actions taken based upon bona fide seniority systems, *Teamsters v. United States, supra* ; *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), unions may still be held liable for violations of Title VII, 42 U.S.C. § 2000e–2(c),[23] where seniority is not a factor.

> [I]n negotiating as well as in administering a contract a union is obliged to protect all those it represents and may not consent to provisions or take positions that discriminate on racial grounds against some of its people. A union's duty, in representing its members and protecting them from invidious treatment, must certainly be broader than simply refusing to sign overtly discriminatory agreements.

*Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App.D.C. 69, 79, 478 F.2d 979, 989 (1973).

■ Tacit union acquiescence in an employer's discriminatory practices is sufficient to render it liable. *Macklin, supra,* 156 U.S.App.D.C. at 79, 478 F.2d at 989; *E.E.O.C. v. Enterprise Ass'n. Steamfitters,* 542 F.2d 579, 589 (2d Cir. 1976); *cf. Robinson v. Lorillard*, 444 F.2d 791, 799 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

■ Although the BPBA had no obligation to challenge the statutory hiring requirements used by the New York Civil Service Commission, the evidence indicates that the BPBA played little, if any, affirmative role in Department racial relations. By displaying, at best, an indifferent attitude to the plight of black officers, the BPBA actually served to cut such officers off from participation in union activities as well from a meaningful grievance procedure to challenge the inequality of selection procedures and working conditions. ✓

I find that, although the record does not detail specific instances of discriminatory practice, the lack of any black BPBA delegates, the organization's discriminatory reputation among black officers, and its acquiescence in the discriminatory practices of the Department establish BPBA liability.

## VIII. *RELIEF*

The court has found a pattern and practice of discrimination against blacks, women and SSAs on the part of the City of Buffalo through its Police and Fire Departments. This includes specific court findings of discrimination in hiring requirements by both the Police and Fire Departments as well as by the Buffalo Civil Service Commission. It also includes a court finding of discrimination by the Police Department in terms and conditions of employment and in

23. 42 U.S.C. § 2000e–2(c) states:

It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

several individual claims. In addition, the BPBA has been found to have practiced discrimination in its representation of minority police officers. The City of Buffalo therefore stands in violation of Title VII of the Civil Rights Act of 1964, as amended, and of § 122(a) of the State and Local Fiscal Assistance Act of 1972.

■ The court must now fashion a remedy incorporating injunctive and other appropriate forms of relief. It has extensive equitable powers to remedy these violations. *See United States v. Wood, Wire and Metal Lathers International Union, Local 46,* 471 F.2d 408, 413 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). In such cases the court not only has the power but also the duty to enjoin future discrimination and as far as possible to require the elimination of continuing effects of past discrimination. *See Albemarle Paper Co. v. Moody, supra ; Rios v. Enterprise Ass'n Steamfitters, Local 638,* 501 F.2d 622, 629 (2d Cir. 1974).

Relief imposing numerical goals and accelerated hiring and promotion of women and minority persons has been uniformly held to be appropriate to remedy past discrimination in hiring practices in at least seven circuits, including our own. *Rios, supra* at 629; *Kirkland v. New York State Dept. of Correctional Services,* 520 F.2d 420 (2d Cir. 1975), *rehearing denied,* 531 F.2d 5 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), *rehearing denied,* 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1977); *see also United States v. City of Chicago,* 549 F.2d 415, 436–437 (7th Cir. 1977). The recent Supreme Court decision in *Regents of the University of California v. Bakke,* —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), should have little, if any, impact on the power of this court to impose such a remedy in this case. The Supreme Court's invalidation of racial quotas in that instance may be distinguished since the quota was not part of a court remedy for a prior finding of discrimination. This position is buttressed by the Supreme Court's refusal to hear challenges to a consent decree providing affirmative

action goals and targets in an employment discrimination context. *See EEOC v. American Telephone & Telegraph Co.,* 556 F.2d 167 (3d Cir. 1977), *cert. denied sub nom. Communications Workers of America v. EEOC,* —— U.S. ——, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).

The court may also impose further injunctive relief regarding privileges, terms and conditions of employment. Some limits, however, may be placed upon this authority. *See Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

■ To enforce these orders the court has the authority to withhold payment of federal revenue sharing funds under the State and Local Assistance Act of 1972 until defendants have achieved compliance. *See United States v. City of Chicago,* 411 F.Supp. 218 (N.D.Ill.1976), *aff'd* 549 F.2d 415 (7th Cir. 1977).

Although the Government has already submitted proposals for a remedy in this suit, the court recognizes that some time has elapsed since trial. Many practices brought into evidence at trial were already dated at that time; other more recent practices are no longer current. The eligibility lists derived from the tests at issue have expired and new tests have recently created new eligibility lists. Therefore, before the court grants any of the above-mentioned relief or alternatives, I direct the parties to appear for a meeting with the court on September 26, 1978 at 9:00 a. m. to present their positions on appropriate relief. Prior to the hearing, on or before September 19, 1978, the parties shall submit memoranda outlining the scope of relief and providing the legal basis for such. In the meantime the defendants are enjoined from making any new appointments to the Police or Fire Departments.

So ordered.