**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**CITY OF BUFFALO et al.,**
**Defendants–Appellants.**

**No. 908, Docket 78–6164.**

United States Court of Appeals,
Second Circuit.

Argued May 5, 1980.

Decided Oct. 20, 1980.

As Amended Dec. 29, 1980.

Drew S. Days, III, Asst. Atty. Gen., Dept. of Justice, Washington, D. C. (Jessica Dunsay Silver, and Irving Gornstein, Dept. of Justice, Washington, D. C. and Richard J. Arcara, U. S. Atty. for the Western Dist. of New York), for plaintiff–appellee.

Joseph P. McNamara, Corp. Counsel, Buffalo, N. Y. (James J. McLoughlin, Senior Deputy Corp. Counsel, Buffalo, N. Y.), for defendants–appellants.

Before FRIENDLY, FEINBERG and TIMBERS, Circuit Judges.

PER CURIAM:

This appeal is from a final decree in an action by the United States against the City of Buffalo, which has been pending for some time in the District Court for the Western District of New York, concerning employment discrimination by the City's police and fire departments against blacks, Spanish–surnamed Americans (SSA's) and women. Finding that the City had engaged in a pattern or practice of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e et seq., Chief Judge Curtin in November, 1979, entered a final decree granting injunctive and monetary relief. The City appealed from certain aspects of the decree.

After studying the briefs and appendix and hearing argument on May 5, 1980, we were satisfied that Chief Judge Curtin's findings of fact were not erroneous and that his conclusions of law were proper, for reasons which are stated in his careful and persuasive opinions, notably United States v. City of Buffalo, 457 F.Supp. 612 (W.D.N.Y.1978), and need not be repeated here. Our only concern was with Part II of his decree, entitled "GOALS", the most pertinent portions of which are set out in the margin.[1] Since several other cases involv-

---

1. 2. The City shall seek to achieve the long–term goal of reaching a minority composition in the ranks of uniformed personnel within the Police and Fire Departments comparable to that of the work force within the city as a whole, according to the most recent census.

3. The City shall adopt and seek to achieve the interim goal of making 50% of all entry level and/or police officer appointments from among qualified black and SSA applicants.

4. The City shall adopt and seek to achieve an interim goal of making 50% of all firefighter appointments from among qualified black and SSA applicants.

5. No long–term goal for hiring females in the Police Department shall be set at this time. However, the defendants shall adopt and seek to achieve an interim goal of making 25% of all entry level and/or police officer appointments from among qualified women applicants. A minority woman shall count toward both interim goals.

6. In addition, the defendants shall take affirmative steps to recruit and hire women in numbers commensurate with their interest and with their ability to qualify on the basis

ing the use of racial quotas were then under advisement by other panels, we decided to defer decision until the results of their deliberations were available, although, as matters turned out, only *Guardians Association of the New York City Police Department, Inc. v. Civil Service Comm'n of the City of New York,* 630 F.2d 79 (2d Cir. 1980), proved to have real significance.[2]

As appears from the decree, the district court set "interim hiring goals"[3] of 50% for minorities in the Police and Fire Departments and of 25% for women in the Police Department. The figures compare with a City work force roughly 18% black, 4% SSA and 41% female. In contrast, according to appellants' brief, p. 26, of the persons who actually appeared to take the written police examination in 1973, 6.08% were black males, 1.98% Hispanic males, 12.76% white females, 5.39% black females, and .68% Hispanic females. The corresponding figures for the firefighters' examination in 1973 were 15.78% black males, 1.65% Hispanic males, 1.53% white females, 1.25% black females, and .13% Hispanic females. The percentages for those applying to take the examinations were for the most part somewhat higher. The City urges that "Since these applicants were recruited after an intensive campaign, these figures provide a more realistic measure of minority and female interest in police and firefighter positions than do general population figures."[4]

◼ We entertain no doubt that, in light of the evidence in this case and our prior decisions on the subject, the district court was justified in setting interim hiring requirements for blacks and SSA's at a percentage higher than their representation in the City's total work force or the applicant pool, and for women at a percentage higher than their representation in the applicant

of performance related criteria for positions as firefighters. Within 18 months following December 11, 1978, the Court shall, upon motion of plaintiff and after evidentiary hearing, consider the entry of specific long–term and interim hiring goals for women in this position.

7. The interim hiring goal for minorities shall remain in effect until the minority composition of the uniformed personnel of the Police Department and Fire Department is at least equal to the percentage of minorities in the labor force of the City of Buffalo according to the most recent census, or until this Court has found, after a hearing, that all proposed selection procedures for entry level and/or police officer and firefighter positions have been validated in accordance with the *Uniform Guidelines on Employee Selection Procedures,* 43 F.R. 38290 *et seq.* (August 25, 1978), and that no further interim goals are appropriate. Nothing herein shall preclude plaintiff United States from advocating the continuance of the interim goals on the basis that the continuing effects of past discrimination have not been eliminated.

8. The interim goal for women shall remain in effect until this Court has found, after a hearing, that all proposed selection procedures for entry–level and/or police officer positions have been validated in accordance with the *Uniform Guidelines on Employee Selection Procedures,* 43 F.R. 38290 *et seq.* (August 25, 1978), and that no further interim goals are appropriate. Nothing herein shall preclude plaintiff United States from advocating the continuance of the interim goals on the basis that the continuing effects

of past discrimination have not been eliminated.

2. Among other things, the *Guardians Association* decision also clearly answers the City's arguments with respect to the validation of the 1973 Police Department employment test at issue in this case. While the City urges that the district court erred in placing on it the burden of showing that "criterion validation" was infeasible, we note that Judge Curtin in fact accepted the City's proffer of "content validation," in the form of a "factor analysis" of the 1971 patrolman examination. 457 F.Supp. at 623–24. His conclusion that this analysis provided an inadequate basis for validation of the 1973 test is fully consistent with the principles set out and applied in *Guardians Association.* See 630 F.2d at 94–98.

3. The interim relief in this case, though described as "goals" by the district court at various points, consisted of affirmative hiring requirements which the defendants were obligated to fulfill. See *Guardians Association, supra,* 630 F.2d at 111 n.29.

4. Chief Judge Curtin's opinion of December 11, 1978, states that the parties had agreed upon the terms of a remedial order with respect to the Fire Department, which was incorporated "in substance" in his judgment. However, the City attacks the provisions of the decree with respect to the Fire Department along with those relating to the Police Department, and the United States does not argue that it is precluded from doing so.

pool. We agree that, as Judge Newman stated in *Guardians Association, supra,* 630 F.2d at 109, even interim hiring ratios "greater than the minority percentage in the applicant pool or the relevant work force, should be imposed only upon clear evidence and appropriate findings of the need to redress demonstrated prior discrimination of long standing that has had a significant impact on minority employment." However, those criteria were met here. The district judge found, on ample evidence, that the proven violations were serious and that little or no progress had been made in remedying them. Moreover, he concluded that the percentages of minorities and women applying for or taking the 1973 examinations could not be relied upon because the history of discrimination in hiring by both departments suggested that those percentages did not reflect the actual interest of those groups in employment as police or fire department officers.

 We cannot quarrel with the district court's requirement that, on an interim basis, minorities receive 50% of all entry level positions, police officerships, and firefighter appointments and that women receive 25% of all entry level positions and police officerships. The choice of any particular interim hiring ratio is necessarily somewhat arbitrary. Here, as in *Vulcan Society of New York City Fire Department v. Civil Service Comm'n,* 490 F.2d 387, 399 (2 Cir. 1973), the ratio chosen was appropriate in light of "the resentment of non–minority individuals against quotas of any sort and of the need of getting started to redress past wrongs." The important thing is that the duration of such hiring quotas should be no longer than is necessary. The figures chosen here were not unreasonably high in light of the finding of serious discrimination and lack of previous progress, the slow rate of hiring projected in the police department, and the likelihood that prior discrimination had discouraged minorities and women from applying for jobs.

 With respect to duration, the court said in *Guardians Association, supra,* 630 F.2d at 109 (footnote omitted):

If a hiring ratio is imposed beyond the interim period in which a valid selection procedure is developed in order to reach a required long–term target, the justification for its use must be especially compelling.

If the district court had contented itself with imposing hiring ratios until it had found that proper selection procedures had been established and that no further hiring requirements were appropriate, with the United States having the right at that time to advocate such further requirements on the ground that the continuing effects of past discrimination had not been eliminated, the City would have had no cause to complain. The City likewise can have no rational basis for objecting to the provision in paragraph 7, see note 1, that the interim hiring ratios should cease at an earlier date in the event that the minority composition of the uniformed personnel of the Police Department and the Fire Department should become equal to or greater than the percentage of minorities in the City's labor force as determined by the most recent census. What gives concern is the provision in paragraph 2 requiring the City "to seek to achieve the long–term goal of reaching a minority composition in the ranks of uniformed personnel within the Police and Fire Departments comparable to that of the work force within the city as a whole, according to the most recent census."

 The United States does not attempt to defend this portion of the decree on the merits but asserts rather that, in view of paragraphs 7 and 8, it serves no operative purpose and can be disregarded. Brief, p. 37, n.14. We cannot accept this contention. Paragraph 2 must be read as meaning what it says. It would afford a basis, in addition to the appropriate one mentioned in the last sentence of paragraph 7, for arguing that hiring ratios *must* be continued even after valid selection procedures had been approved. Indeed, so long as it remains in the decree, the City, even after having been relieved of interim hiring ratios because these were found to be no longer appropriate, might be required to take other meas-

ures to achieve "the long–term goal" prescribed in paragraph 2.

■ If, as the United States contends in its brief, paragraph 2 has no effect, it should be stricken as confusing surplusage. If, as we believe, it does have an effect, it should likewise be.[5] While disparities between the proportion of minorities or women in the work force or the applicant pool and those who pass examinations or are employed have evidentiary value with respect to discrimination, once proper selection procedures have been established judicial prescription of further goals or the use of quota hiring to meet them is only justified if necessary to eliminate the effects of past discrimination. There is no requirement, either constitutional or statutory, that each identifiable group of employees should exactly reflect the racial or sexual composition of the work force.[6] We consider all this to be the teaching of our cases, see *Kirkland v. New York State Department of Correctional Services*, 520 F.2d 420, 430 (2 Cir. 1975), *rehearing in banc denied with three judges dissenting*, 531 F.2d 5 (2 Cir. 1975), *cert. denied*, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *Chance v. Board of Examiners*, 534 F.2d 993, 998 (2 Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *Equal Employment Opportunity Comm'n v. Local 638*, 532 F.2d 821, 831 (2 Cir. 1976). Once valid selection procedures have been instituted, the determinations whether it is necessary to prescribe ultimate goals to eliminate the effects of past discrimination, whether such goals should be a proportion of the total work force or some smaller and, in some cases, more representative unit,[7] and whether attainment of such goals must be through continued hiring quotas or may be by less abrasive measures such as recruitment programs raise questions of the utmost difficulty. Such questions should not be faced sooner than need be and should then be determined after the most careful consideration of detailed evidence. Here the record is barren of evidence that with properly validated selection procedures minorities would have applied for and achieved posts in the uniformed services in a ratio comparable to their numbers in the City's work force as a whole. Indeed, the court made no specific finding that interim relief would be inadequate to eradicate the effects of past discrimination and that it was therefore necessary to prescribe a long–term goal. Moreover, the entire issue can be better considered, on a fuller record,

---

**5.** The order under review by this court in *Guardians Association, supra*, contained a "long–term" goal provision similar to that in the decree before us, although the opinion of the district court had not discussed the subject. This court concluded that the evidence in the record and the findings of the district court were insufficient to support affirmative hiring quotas of any sort, whether interim or long–term, 630 F.2d at 112–113. Only an interim compliance quota was permitted, i.e., a quota based on the minority percentage in either the applicant pool or the relevant work force, *id.* at 114.

**6.** *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), is not to the contrary. That case held only that Title VII was not violated by an agreement between an employer and a union setting aside half the openings in an in–plant craft–training program for black employees until their percentage in the plant's work force reached a percentage equal to that in the local labor force. The Court was at pains to point out, *id.* at 200, 99 S.Ct. at 2726 (emphasis in original):

Since the Kaiser–USWA plan does not involve state action, this case does not present an alleged violation of the Equal Protection Clause of the Fourteenth Amendment. Further, since the Kaiser–USWA plan was adopted voluntarily, we are not concerned with what Title VII requires or with what a court might order to remedy a past proved violation of the Act. The only question before us is the narrow statutory issue of whether Title VII *forbids* private employers and unions from voluntarily agreeing upon bona fide affirmative action plans that accord racial preferences in the manner and for the purpose provided in the Kaiser–USWA plan.

**7.** In *Rios v. Enterprise Ass'n Steamfitters Local 638*, 501 F.2d 622 (2 Cir. 1974), this court recognized that, for reasons there stated, a goal based on a percentage of the work force would be more accurate than one based on a percentage of the total population. The court did not discuss whether a sample based on only a portion of the work force might be still more representative of what minorities could have expected to achieve but for the discrimination.

when the City has satisfied the court that it has developed valid selection procedures, if the United States then argues that quota hiring requirements should nevertheless be continued. Without prejudice to what, if anything, may then be decided with respect to the need for an ultimate goal, we think the decree should be modified by striking pararaph 2 and, as so modified, is affirmed. The United States may recover two–thirds of its costs.